## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**THE SMITH LAW FIRM, PLLC**                                                          **PLAINTIFF**


**v.**                                                                    **NO. 3:26-CV-101-DPJ-ASH**

**ELLINGTON FINANCIAL INC.;**
**ERIC MARKS;**
**ICG INVESTMENTS, INC.;**
**BRIAN MARSHALL;**
**STIFEL FINANCIAL CORPORATION;**
**JUSTIN BRASS;**
**SLF1 FUNDING, LLC; AND**
**JOHN DOES 1-10**                                                            **DEFENDANTS**

### FIRST AMENDED COMPLAINT
### (JURY TRIAL DEMANDED)

The Smith Law Firm, PLLC, by and through undersigned counsel, files this First Amended

Complaint against the Defendants, and in support thereof would show unto this Honorable Court

the following facts and matters, to-wit:

### PARTIES

1.      The Plaintiff, The Smith Law Firm, PLLC ("SLF"), is a Mississippi Professional

Limited Liability Company with its principal place of business at 300 Concourse Blvd, Suite 104

in Ridgeland, Mississippi. SLF's registered members are residents of the State of Mississippi.

2.      Defendant Ellington Financial Inc. ("Ellington") is a corporation organized under

the laws of the State of Delaware and with its principal place of business located at 53 Forest

Avenue, Old Greenwich, CT 06870. Ellington can be served with process by serving its registered

agent, Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, DE 19904, or by any other

means permitted by the *Federal Rules of Civil Procedure*.

1

3.      Defendant Eric Marks is an adult resident citizen of the State of Connecticut.  He may be served with process of this Court at his office located at 53 Forest Avenue, Old Greenwich, CT 06870 or by any other means permitted by the *Federal Rules of Civil Procedure*. At all times relevant to this Complaint, Defendant Marks was an employee or agent of Ellington, where he serves as Portfolio Manager.

4.      Defendant ICG Investments Inc., formerly known as Intermediate Capital Group, Inc. ("ICG") is a corporation organized under the laws of the State of Delaware and with its principal place of business located at 277 Park Avenue, New York, New York 10172. ICG can be served with process by serving its registered agent, CT Corporation System, 28 Liberty Street, New York, NY 10005,  or by any other means permitted by the *Federal Rules of Civil Procedure*.

5.      Defendant Brian Marshall is an adult resident citizen of the State of New York. He may be served with process of this Court at his office located at 277 Park Avenue, New York, New York 10172 or by any other means permitted by the *Federal Rules of Civil Procedure*. At all times relevant to this Complaint, Defendant Marshall was an employee or agent of ICG, where he serves as Senior Portfolio Manager.

6.      Defendant Stifel Financial Corporation ("Stifel") is a corporation organized under the laws of the State of Delaware and with its principal place of business located at 501 North Broadway, St. Louis, Missouri 63102. Defendant Stifel may be served with process of this Court by serving its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE  19801, or by any other means permitted by the *Federal Rules of Civil Procedure*.

7.      Defendant Justin Brass is an adult resident citizen of the State of New York. He may be served with process of this Court at his current office located at 100 Mamaroneck Ave., Suite 301, Mamaroneck, NY 10543 or by any other means permitted by the *Federal Rules of Civil*

*Procedure*. At all times relevant to this Complaint, Defendant Brass was an employee or agent of Stifel Financial Corporation, where he served as Managing Director and Co-Head of the Litigation Finance Group. Currently, Defendant Brass is Co-CEO and Senior Managing Director of JBSL Legal Finance Company.

8.    Defendant SLF1 Funding, LLC, is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, none of the members of SLF1 Funding LLC are citizens of the State of Mississippi. SLF1 Funding LLC can be served with process by serving its registered agent, Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, DE 19904 or by any other means permitted by the *Federal Rules of Civil Procedure*.

9.    Defendants John Does 1-10 are unknown and unnamed persons and/or entities who are potential parties to this action and may also be liable for the claims asserted herein, who include but are not limited to agents, servants, affiliates, employees, representatives of the Defendants named above or any other related person or entity. Upon learning their identities, SLF may move for leave to amend this complaint, if necessary, which shall relate back to the original filing pursuant to the FEDERAL RULES OF CIVIL PROCEDURE and other applicable laws.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1332 and related authority, as it is a case or controversy between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

11.    This Court has personal jurisdiction over the Defendants pursuant to Mississippi's Long-Arm Statute, as the Defendants entered into contracts which were to be performed in whole or in part by the parties in the State of Mississippi and the Defendants have, as alleged herein, committed torts that have caused injury to Plaintiff in the State of Mississippi.

12.    Defendants also have sufficient contacts with the State of Mississippi such that this Court's jurisdiction comports with due process, including, but not limited to, funding talcum powder litigation in support of a law firm that is based in and conducts its business in the State of Mississippi.

13.    Venue is proper in the United States District Court for the Southern District of Mississippi, Northern Division, pursuant to 28 U.S.C. § 1391, as the substantial acts and/or omissions and events that caused Plaintiff's injuries occurred in the district and division in which this matter has been filed, the property that is the subject of the litigation (SLF's collateral for the lending agreements described herein) is located in this district and division, and because Defendants are subject to personal jurisdiction in this district and division as set forth in the preceding paragraphs.

## FACTS

14.    Plaintiff SLF is a nationally recognized personal injury law firm that represents individuals injured by defective products.

15.    Among other matters, SLF conceived of, developed the evidentiary and scientific support for, and filed the first cases alleging that talc-based body powders cause ovarian cancer ("Talcum Powder Litigation").

16.    SLF filed the first talc case in South Dakota in 2009 and, in 2013, tried the first case—to a plaintiff's verdict—in *Berg v. Johnson & Johnson, et al.*, No. 4:09-cv-04179-KES (D.S.D.).

17.    The law firm of Beasley, Allen, Crow, Methvin, Portis and Miles, P.C. ("Beasley Allen") began showing interest in the Talcum Powder Litigation in November 2013.

18.     After extensive discussions, in December 2013, SLF, Beasley Allen, and another law firm, Porter Malouf, P.A. ("Porter Malouf"), verbally agreed to pursue a joint venture with respect to the Talcum Powder Litigation.

19.     On December 19, 2013, Beasley Allen sent a letter to SLF and Porter Malouf memorializing the Joint Venture Agreement ("JV Agreement") between Plaintiff, Beasley Allen, and Porter Malouf regarding the Talcum Powder Litigation.

20.     Attorneys at SLF and Porter Malouf signed the JV Agreement on January 23, 2014.

21.     The JV Agreement assigned various roles to SLF, Porter Malouf, and Beasley Allen, with respect to responsibilities for both work in and funding of the Talcum Powder Litigation.

22.     As detailed below, SLF purchased Porter Malouf's interest in the Joint Venture. Because of this, references to the current Joint Venture refer to the venture of its current members, SLF and Beasley Allen.

23.     The Joint Venture between SLF and Beasley Allen consists of approximately 11,500 Talcum Powder cases. The Joint Venture has, over the years, also screened and elected not to pursue approximately 70,000 cases.

24.     The prosecution of the Talcum Powder Litigation has been lengthy and unpredictable. As detailed above, SLF filed the first talc case in 2009, nearly 17 years ago. Since then, the Talcum Powder Litigation has been placed into a federal Multidistrict Litigation (MDL) in New Jersey and has also been the subject of attempts by various defendants to file for bankruptcy protection. Most notably, the Johnson & Johnson defendants have filed three separate bankruptcy proceedings, all of which were eventually dismissed.

25.     The prosecution of the Talcum Powder Litigation has also been expensive, with costs of prosecution including, but not being limited to, employment of attorneys and staff to screen, investigate, handle, and litigate cases; medical records costs; expert witness fees and expenses; case acquisition costs; trial costs; MDL costs and assessments; bankruptcy defense costs over the course of numerous bankruptcies; document and litigation management technology; and nationwide travel expenses. This list of prosecution costs is illustrative, but by no means exhaustive.

26.     The prosecution of the Talcum Powder Litigation has also come at great opportunity cost to SLF. SLF has turned away other cases in order to devote significant time and resources to the pursuit of the Talcum Powder Litigation.

27.     In order to meet its funding obligations in the Talcum Powder Litigation and to fund operational costs of the law firm while the litigation is pending, SLF entered into financing agreements. Two of those agreements are the subject of this Complaint.

28.     The first loan is known as the SLF1 Loan. The executed SLF1 Loan agreement is incorporated herein by reference but is not attached in order to protect confidential and proprietary information.

29.     The SLF1 Loan was entered into between SLF and Defendant SLF1 Funding, LLC, whose members include Defendants Ellington, ICG, and Stifel. The negotiation and execution of the SLF1 Loan involved the use of interstate wire communications.

30.     The SLF1 Loan was the first loan at issue and is collateralized by all fixtures and tangible personal property in SLF's office and all case proceeds from all SLF cases whether by suit, judgment, settlement or otherwise, which includes 1/3 of SLF's fee interest and litigation expenses receivable from the Talcum Power Litigation.

31.     The SLF1 Loan structure included a 1st lien facility ("Tranche 1") and a committed 2nd lien facility ("Tranche 2").  Tranche 1 was bifurcated into two separate pieces, a Tranche 1-A note of tens of millions of dollars and a Tranche 1-B note also of tens of millions of dollars. From Tranche 1, SLF received net proceeds to payoff prior debt and fund current operations of SLF.

32.     Tranche 1 featured a cash interest requirement that required SLF to make regular quarterly cash payments to the lenders (regardless of whether any cases from the Talcum Powder Litigation settled), and as part of this requirement, the lenders pre-funded 18 months of cash interest in a reserve account to ensure adequate funds to cover the first 18 months of interest payments. Given the significant cash interest burden to SLF, SLF wanted certainty that it could make the quarterly cash interest payments, even in the event the Talcum Powder Litigation was delayed, and no income was received by SLF.  Accordingly, SLF and the lenders agreed to include as part of the financing a second tranche that was committed and could be utilized by SLF to fund cash interest requirements if needed.

33.     The second tranche, Tranche 2, included a committed, but unfunded facility for SLF to draw upon as needed in the aggregate amount of approximately $30 Million. SLF viewed this as the "contingency tranche" that ensured access to additional ample liquidity in the event the Talcum Powder Litigation dragged on longer than anticipated.

34.     The purpose of Tranche 1 of the SLF1 Loan was, in part, to meet operational costs and SLF's expense obligations in the Talcum Power litigation. The purpose of securing the Tranche 2 commitment in the agreement was to have funds available in case the Talcum Powder Litigation lasted longer than expected.  Additionally, SLF wanted certainty that it would be able to cover the sizeable cash interest obligations the lenders imposed in the Tranche 1 facility after the 18 month cash interest reserve was exhausted to avoid a default on the SLF1 Loan.

35.     Part of the SLF1 Loan agreement was that SLF was to pay an Unused Commitment Fee for all committed portions of Tranche 2 funds that had not yet been accessed. This commitment fee was a percentage of the unused commitment amount per month (approximately $25,000) and was paid by SLF starting in 2021 and for many months thereafter to ensure continued access to the Tranche 2 funds if they were needed in the future. SLF paid over $300,000 for fourteen months of commitment fees for the liquidity of the Tranche 2 funds. The payment of the commitment fees by SLF involved the use of interstate wire communications.

36.     The second loan at issue is known as the TA1 Loan. The executed TA1 Loan agreement is incorporated herein by reference but is not attached in order to protect confidential and proprietary information.

37.     The TA1 Loan was entered into between SLF and Defendant ICG.

38.     The TA1 Loan was the second loan at issue and is collateralized by 2/3 of SLF's fee interest from The Talcum Power litigation.

39.     The purpose of the TA1 Loan was to buy out the interest of Porter & Malouf in the Joint Venture Agreement and, correspondingly, increase SLF's legal fee potential in the Talcum Powder Litigation.

40.     One of the reasons SLF was confident in executing the TA1 Loan and buying out Porter Malouf's interest was the access it had to approximately $30 Million in available funds under Tranche 2.

41.     When the Talcum Powder Litigation got delayed by multiple bankruptcies filed by the defendants in that litigation, SLF submitted a request to draw on the Tranche 2 funds in SLF1. The Defendants denied the request.

42.     The improper denial of access to the Tranche 2 funds resulted in SLF not being able to meet its required cash interest payments due for the SLF1 Loan. This placed SLF in default and resulted in SLF incurring exorbitant compounding interest and additional fees. SLF also had to negotiate additional agreements with lenders and agree to exorbitant fees in order to have access to its own operating capital. Had SLF had access to the Tranche 2 funds, the default and resulting damages from it would not have happened.

43.     In the time since SLF went into default on the SLF1 Loan, SLF has, on numerous occasions, attempted to restructure the SLF1 Loan agreement with the Defendants. These efforts have been rebuffed.

44.     In the time since SLF went into default, SLF also learned that the Defendants never had any intention to fund Tranche 2 of the SLF1 Loan and that decision was made by and/or known by all Defendants prior to the execution of the SLF1 loan. The Defendants never communicated this to SLF prior to SLF entering into the SLF1 Loan, despite this being a material term to the SLF1 Loan facility. These facts were communicated by ICG employee and co-conspirator Brian Marshall to an SLF representative on or about February 14, 2025.

45.     The Defendants have stated that they only included the approximately $30 Million of Tranche 2 in the SLF1 Loan agreement to artificially increase the overall size of the loan so that it could be placed in a Collateralized Loan Obligation (CLO) and also increase the yield to the Third Party Lenders via the additional commitment fee they charged SLF.

46.     A CLO is a form of a structured security that bundles a pool of lower-rated corporate loans and sells them to investors. CLOs offer an opportunity for investors to gain exposure to higher-than-average returns by assuming default risk. CLOs are similar to

collateralized mortgage obligations in structure but differ mainly because they are backed by company loans rather than mortgages.

47.    By placing the SLF1 Loan into a CLO, the Defendants gained benefits.

48.    By including the Tranche 2 funds in the SLF1 Loan, indicating that those funds would be available if necessary, and accepting the monthly commitment fees for Tranche 2 with no intention of ever funding a request for a draw on Tranche 2, the Defendants induced SLF to enter the agreement on false, material grounds. In the end, the contract that SLF believed it was entering into for the SLF1 Loan and the actual contract were two different things because of Defendants' fraud and/or material misrepresentations regarding Tranche 2.

49.    SLF relied to its detriment on the availability of the Tranche 2 funds. In the time between the execution of the SLF1 Loan agreement and denial of access to Tranche 2 funds, SLF made business decisions based on the belief that it had an additional $30 Million funding facility available. For example, SLF invested funds in other litigation efforts and entered into Joint Venture agreements with firms with terms based upon SLF's reliance on future funding access. Had SLF known that it did not have the Tranche 2 funding available, it would have made different business decisions.

50.    In addition, when the SLF1 Loan agreement was entered into, there were other lenders who desired to enter similar agreements with SLF. Had SLF known that the Defendants never intended to fund the Tranche 2 funds in the SLF1 Loan agreement, SLF would have entered into agreements with other lenders.

51.    Further, SLF was familiar with the unpredictability of the Talcum Powder Litigation and the delays that could impact the course of that litigation. It was this knowledge that led SLF to negotiate the Tranche 2 portion of the SLF1 Loan agreement. Had SLF known that the

Defendants never intended to grant access to the Tranche 2 funds, SLF would not have entered into the agreement since the availability of contingency funds in the event of further delays was a key and material component of any funding agreement that SLF sought.

52.     Applicable law limits the Defendants from having a direct interest in legal fees from the Talcum Powder Litigation or any decision-making power with respect to that litigation. The SLF1 Loan agreement, in Section 9.25, makes clear that the lenders could exercise no decision-making power in the Talcum Powder Litigation. By their conduct, the Defendants are attempting to gain an equity interest in the Talcum Powder Litigation fees and/or decision-making power in the Talcum Powder Litigation, in contravention of applicable law.

53.     To summarize, the Defendants have executed what is commonly referred to as a "loan to own" scheme.  From the outset the Defendants conspired to defraud SLF knowing that this fraud would most likely result in SLF defaulting on its SLF1 loan interest payments and quarterly talc expenses which would allow the Defendants to pirate the SLF case fees. The Defendants' motivation was pure greed, realizing the billions of dollars at stake in the talc litigation and in the SLF case portfolio.  Also, the Defendants have failed to respond to multiple refinance, restructuring, and/or settlement proposals offered over the past several years by SLF, Dundon Advisers LLC, and Beasley Allen.  This provides further evidence of the Defendants execution of their "loan to own" scheme.

## COUNT 1: FRAUD IN THE INDUCEMENT OF THE SLF1 LOAN

54.     SLF incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

55.     By the conduct described herein, the Defendants fraudulently induced SLF into entering into the SLF1 Loan agreement.

56.     By the conduct described herein, the Defendants made fraudulent misrepresentations regarding access to the Tranche 2 funds of the SLF1 Loan agreement for the purpose of inducing SLF to enter into the agreement.

57.     At the time the Defendants fraudulently misrepresented the availability of Tranche 2 funds to SLF, they had no intention of ever funding Tranche 2. They did, however, have the intention of collecting the hundreds of thousands of dollars of commitment fees paid by SLF for the liquidity of Tranche 2 funds and likewise had the intention of artificially increasing the size of the SLF1 Loan in order to gain their own benefit by placing the SLF1 Loan agreement into a CLO.

58.     Based on this conduct, the Defendants fraudulently induced SLF to enter into the SLF1 Loan agreement and are liable to SLF for damages, including punitive damages.

59.     In addition, the Defendants' conduct resulted in the SLF1 Loan Agreement being fraudulent at the time of its execution. Thus, the entire SLF1 Loan agreement should be held as void *ab initio*, including, but not limited to, the arbitration and forum selection provisions therein.

**COUNT 2: FRAUD IN THE INDUCEMENT OF THE TA1 LOAN AS TO DEFENDANT ICG**

60.     SLF incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

61.     By the conduct described herein, Defendant ICG made fraudulent misrepresentations regarding access to the Tranche 2 funds of the SLF1 Loan agreement (in which ICG was one of several lenders) for the purpose of inducing SLF to enter into the TA1 Loan agreement with ICG.

62.     At the time that ICG fraudulently misrepresented the availability of Tranche 2 funds to SLF, it was aware that there was no intention of ever funding Tranche 2. ICG and other Defendants did, however, have the intention of collecting the hundreds of thousands of dollars of

commitment fees paid by SLF for the liquidity of Tranche 2 funds and likewise had the intention

of increasing the value of the agreement in order to gain their own benefit by placing the SLF1

Loan agreement into a CLO.

63.    In addition, ICG intended to use their misrepresentation (and those of the other

lenders in the SLF1 Loan) regarding the availability of Tranche 2 funds in the SLF1 Loan

agreement to induce SLF into entering into the TA1 Loan agreement for the purpose of buying out

Porter Malouf's interest in the Joint Venture Agreement.

64.    Based on this conduct, ICG fraudulently induced SLF to enter into the TA1 Loan

agreement and is liable to SLF for damages, including punitive damages.

65.    In addition, Defendant ICG's conduct resulted in the TA1 Loan agreement being

fraudulent at the time of its execution. Thus, the entire TA1 Loan agreement should be held as

void *ab initio*, including, but not limited to, the arbitration and forum selection provisions therein.

## COUNT 3: TORTIOUS INTERFERENCE WITH SLF'S JOINT VENTURE AGREEMENT WITH BEASLEY ALLEN

66.    SLF incorporates by reference, as if fully reproduced herein, the allegations

contained in the foregoing paragraphs of the Complaint.

67.    SLF has a contractual relationship with Beasley Allen by way of the Joint Venture

Agreement for prosecution of The Talcum Powder Litigation.

68.    By the conduct described herein, the Defendants have intentionally and willfully

interfered with the business relationships and Joint Venture Agreement between SLF and Beasley

Allen.

69.    The Defendants' interference with these business relationships and contracts is

calculated to cause damage to Plaintiff in its lawful business.

70.    The Defendants' interference with this business relationship was done with the unlawful purpose of causing damage to SLF as well as Beasley Allen without right or justifiable cause and/or by unlawful means.

71.    As a result of the Defendants' interference with this business relationship, SLF has incurred actual damage and loss, for which the Defendants are liable.

72.    The Defendants' conduct also warrants imposition of punitive damages.

## COUNT 4: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

73.    SLF incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

74.    Under applicable law, all agreements contain an implied covenant of good faith and fair dealing in the course of their performance.

75.    By the conduct described herein and as will be proven at trial, the Defendants have breached their duty by operating in a manner inconsistent with the agreed purpose between the parties. The Defendants have acted in a manner that is inconsistent with the justified expectations of SLF, who expected and relied upon the Defendants' good faith and fair dealing in entering into and performing the funding agreements at issue.

## COUNT 5: CIVIL CONSPIRACY

76.    SLF incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

77.    By the conduct described herein, the Defendants or some combination of Defendants combined for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully.

78.     Specifically, the Defendants sought to obtain an equity position with respect to legal fees from the Talcum Powder Litigation and/or decision making power in the Talcum Powder Litigation, as well as to induce SLF into entering the SFL1 Loan agreement with no intention of honoring its terms and funding Tranche 2 despite accepting hundreds of thousands of dollars from SLF in commitment fees for the liquidity of the Tranche 2 portion of the SLF1 Loan agreement.

79.     By inducing SLF to pay and accepting hundreds of thousands of dollars from SLF in commitment fees for the liquidity of the Tranche 2 portion of the SLF1 Loan agreement, the Defendants voluntarily and intentionally devised or participated in a scheme to defraud SLF out of money, with the intent to defraud. The negotiation and execution of the SLF1 Loan Agreement and delivery of funds to pay the commitment fees involved interstate wire communications. As such, Defendants' conduct as alleged herein constituted the unlawful purpose and illegal conduct of Wire Fraud as defined by 18 U.S.C. § 1343 and similar fraud statutes of applicable states' laws.

80.     Also, the Defendants have failed to respond to multiple refinance, restructuring, and/or settlement proposals offered over the past several years by SLF, Dundon Advisers LLC, and Beasley Allen.

81.     Based on this conduct, and any other attempt to accomplish an unlawful purpose or a lawful purpose in an unlawful manner, the Defendants are liable to SLF for the tort of civil conspiracy.

82.     As a proximate result of the civil conspiracy between all or any combination of the Defendants, SLF has been damaged.

## COUNT 6: EQUITABLE ESTOPPEL

83.     SLF incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

84.     As set forth herein, SLF entered credit agreements with the Defendants. Specifically, SLF entered the TA1 loan with ICG and SLF1 loan with all Defendants.

85.     SLF relied upon these agreements and the Defendants' conduct surrounding the execution and implementation of the agreements. SLF spent considerable time and resources to fulfill its obligations in the agreements. As described herein, SLF made business decisions and payments under the agreements in reliance upon the Defendants' representations, promises, and conduct toward SLF.

86.     Under these facts, it would be substantially unfair to allow Defendants to deny what they have previously induced SLF to believe and take action on.

87.     SLF's reliance upon the Defendant's representations ultimately proved to be detrimental to SLF, which prejudiced SLF and caused it to suffer damages.

88.     As a result, the Defendants are liable to SLF under the doctrine of equitable estoppel for damages as stated herein or as will be proved at trial.

**COUNT 7: COMMON LAW INDEMNITY**

89.     SLF incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

90.     In separate litigation, though SLF strenuously denies any liability to Beasley Allen, if SLF should be held liable to Beasley Allen for some of the claims that it asserts against SLF, the Defendants should be required to indemnify SLF with respect to any liability SLF has to Beasley Allen.

91.     In addition, should other funders file claims against SLF and SLF be held liable ins such actions, the Defendants should be required to indemnify SLF with respect to any such liability.

92.     The Defendants should be required to indemnify SLF under circumstances, as SLF did not actively or affirmatively participate in the wrong giving rise to any such liability. Had the Defendants not acted in the manner that led to SLF not being able to meet certain financial obligations, any liability of SLF would not have been incurred.

93.     For these reasons, the Defendants are liable to SLF under the principles of common law indemnity, in the event that SLF is found liable Beasley Allen or any other third party.

## COUNT 8: DECLARATORY RELIEF

94.     SLF incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

95.     SLF also seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and *Federal Rule of Civil Procedure* 57. Specifically, Plaintiff seeks a declaratory judgment that the TA1 and SLF1 funding agreements are void *ab initio*, including their arbitration and forum selection provisions, due to fraud by the Defendants as alleged herein.

96.     This case presents an actual controversy because Defendants have declared their intention to seek excessive funds from penalties and interest due to the defaults caused by their own misconduct and misrepresentations. Under the facts and legal claims set forth herein, this Court should declare that the TA1 and SLF1 funding agreements are void *ab initio*, including their arbitration and forum selection provisions, due to fraud by the Defendants as alleged herein.

## DAMAGES

97.     SLF incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

98.     As a result of the foregoing acts and/or omissions of Defendants, the Plaintiff is entitled to the following damages:

A.  compensatory damages as allowed by law for each of the causes of action set forth above;

B.  extra-contractual damages;

C.  all other economic and non-economic damages allowed by applicable law;

D.  any and all damages of every kind allowable by law as a jury may determine to be just, taking into consideration all damages of every kind to Plaintiff;

E.  punitive damages;

F.  attorney's fees; and

G.  declaratory relief as requested herein.

99.    There exists a causal connection between the acts and/or omissions of the Defendants alleged herein and the damages sustained by SLF and/or liability of SLF to Beasley Allen and/or other liability of SLF to any other third parties, such that said that the acts and/or omissions proximately caused or contributed to SLF's damages.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff The Smith Law Firm, PLLC demands judgment from Defendants and requests that this Court grant relief, jointly and severally, as follows following a jury trial of this matter:

a.      Economic and non-economic damages in an amount provided by law and to be supported by evidence at trial;

b.      Punitive damages;

c.      Pre-judgment and post-judgment interest as allowed by law;

d.      Reasonable attorneys' fees, litigation expenses, expert witness fees, and costs of this litigation, together with all costs of court;

e.    Declaratory relief as requested herein; and,

f.    Any other relief to which Plaintiff may justly and properly be entitled, all

within an amount within the jurisdiction of this Court.

## **JURY DEMAND**

SLF demands a trial by jury on all triable issues.

Respectfully submitted this the 12th day of February, 2026.

**THE SMITH LAW FIRM, PLLC**

BY:    _/s/ Graham P. Carner_____
        Graham P. Carner

OF COUNSEL:

Graham P. Carner (MSBN 101523)
CARNER & ROSEMON, PLLC
401 East Capitol Street, Suite 310 (39201)
Post Office Box 55644
Jackson, MS 39296
Tel: (601) 427-8999
Fax: (769) 233-8941
graham@carnerrosemon.com

19